Good morning, Your Honor. May it please the Court, Marcus Mumford on behalf of the appellant Travis Hymas. I'd like to also reserve just a few minutes, two minutes if I can, for rebuttal. In our brief, we raise several issues. I would like to focus first on the insufficiency of the evidence issues and the fair trial issues that we raise. Mr. Hymas was convicted of five counts of wire fraud based only on the government's evidence of customs and practices and its impermissible per se rules. These are per se rules and customs and practices as evidence that this Court has previously criticized the use of, primarily in Bingham and in the Lowe case, where what they were arguing in this case was there was no direct evidence that Mr. Hymas actually, you know, committed a scheme, but they're arguing all these circumstantial inferences that they're asking the jury to make. And they're arguing these based on their — the evidence of what the customs and practices would have been, or the most egregious, in our mind, is the per se rule. In other words, the — what they were arguing to the Court and to the jury was, well, if this was misstated, then it must be material, then it must be — then it must be evidence of a scheme to defraud. And that's the kind of circular rule that we're arguing here, that, number one, doesn't match the government's actual evidence. And, number two, it's — this Court has already ruled that that kind of argument, that kind of circular reasoning is an impermissible argument to make. It doesn't match the evidence because the government's own evidence was — well, their argument was that Mr. Hymas and his wife misstated their income on five different applications, but really they were just for three different transactions here. The one transaction happened in December 2006. The other one was in February 2007. And the last one was in March of 2007. On the December 2006 application, the — Mr. Hymas put down as his stated income $15,000 a month. The government's own analysis showed and proved that his wife misstated his average — his — the average gross monthly income that he had from the prior 12 months was in excess of that amount. And that's an important point, because we introduced unrebutted evidence at — at trial that the standard for monthly gross income as required by the — the loan application itself was an estimate of all income from whatever sources possible, whatever household sources. Their own analysis showed Mr. — Mr. Hymas had in excess of the amount that he put on that loan application. What are you referring to when you say their own analysis showed that they had in excess of the amount they put on that loan application? There was a — there was an exhibit. It was left off of our original brief, but included with our reply. The record site is ER-2117. It was introduced at trial as Exhibit 16-1A, is — is what it was. And so that shows what the — what the — what the annual — gross annual balance as of December 2006 would have been for Mr. and Mrs. Hymas' — Their balance in their bank account? Yes. Because the — I mean, they had evidence that the verification of deposit was false. It didn't represent what was in the bank account. And also, the verification document had Mr. Hymas' fax number as a header. And so the argument the government makes is the Mr. Hymas had fraudulently represented what assets he had in the bank account. Mm-hmm. I want to — yeah, I want to address that. This — this — this monthly income is a different argument than the one that we're making with respect to the verification of deposit that Your Honor is referring to. That — Your Honor — Your Honor assumes the — and makes the assumption that the government wanted to make without the evidence. There was no evidence that that was actually Mr. Hymas' fax number. That was not in evidence. That was simply — his name appeared at the top of the verification of deposit form. Furthermore, all of the evidence up to that point was that that document would have never been sent to the defendant. That's not all of the evidence, right? Because the teller said sometimes she gives the verification document to the depositor rather than faxing it directly to the lender. No. I think — I think her testimony was to the contrary. She would have never done that. She would have never done that because that's contrary to the rules. And it goes to — but it goes to this point. The customs and practices evidence that was — that was referred to by the — by the government, if they're going to rely on it, then it has to be — it has to go both ways. And if she's going to say, you know what, I would have never — I would have never sent that to the depositor, him or herself, then that has to be the evidence here. And that's — that would be the argument we would make. Of course, we're arguing, no, they can't rely on customs and practices evidence to convict a man who's a small business owner, who worked his guts out in putting his business together and only failed — his business only failed after the market crashed itself. So you don't disagree on appeal here, on a sufficiency claim. We're under Jackson, and we are bound to look at the evidence in the light most favorable to the government and see if any rational juror could have made that finding. So you don't disagree that that's — I don't disagree with the standard being a very high one, as the Court knows. But again, it has to be — you have to look at the — it has to be a de novo review of the sufficiency of the evidence. Can I just get a clarification? You cited an exhibit, was it 16-1A? That's right. Okay. What's the ER's site for that? ER is 2117. It was attached to our reply brief. Here, Your Honor. And the standard — what we're arguing with respect to the standard, Your Honor, is that the — as the government is arguing that the evidence must be viewed in the totality, the standard must be. We need to come back to first principles here. First principles being that we need to make sure that our — that those convicted are convicted of — are convicted based on real evidence and sufficient evidence that actually committed the crime that they're accused of. Here, we're arguing, number one, the evidence is insufficient to show any scheme to commit. If this is a scheme, everything's a scheme. And that can't be the standard that we apply. Second, we're arguing there's insufficient evidence of materiality as to these alleged misstatements. Third, there's no specific intent. And because what happened here is that the court — the court kind of set those things aside and then reversed himself, reversed his own decision — earlier decision in the case that would have excluded tax return evidence to then argue, well, what I said before was apples and oranges with respect to the tax return is now — should now be admitted. You're honest, that simply — that simply can't be the case. That's what the government was able to argue in this instance, was that the tax returns that showed a different industry standard, different things, that showed — by definition it's showing adjusted gross income. They argued, well, because that is so different from this monthly — monthly gross income that's stated on their loan application, there must be some — some fraud here. That's — that simply is impermissible. It denied Mr. Hymas a fair — a trial here. The government also relies on testimony that Mr. Hymas had verified his wife's employment, that he had asked an employee at Smart Home Technology to verify it, and that employee testified that that was not correct. And then there was testimony that Stoney Rice hadn't signed certain verification records about — regarding her employment. What's your response to that argument by the government? Well, the argument with respect to the verification of employment is number — number — oh, number one, the evidence was unrebutted that Mrs. Hymas was a co-owner of this business. She was there. And their testimony that whether or not she had that specific title itself is immaterial here. Furthermore, there's no evidence that he actually was the one who put the title, as it appears, on the loan application itself. In other words, it was — there was this — there was this verification of employment, but that — that the evidence was that the loan application itself was filled out by the — a broker, submitted to their underwriters, and the evidence was that the underwriters would have made any changes to the — they would have changed those forms all of the time, and that — and that it would have then been presented with a whole pile of documents to the — the borrowers at closing. But that's not — what we're arguing is, is that's still insufficient both as to the materiality and as to the direct evidence itself as to Mr. Hymas's involvement. The same argument with respect to Mr. Stoney Rice. He testified that that was not his name. He didn't sign that letter verifying the employment that was in the file itself. But there was no evidence that Mr. Hymas did. Rather, it was an impermissible inference that there — that there — that the government was arguing that because that letter ended up in the file, Mr. Rice didn't know where it came from. Therefore — and it was on — I believe it was on smart home technology letterhead. Therefore, it must have been Mr. Hymas. And that's simply not the case, especially where the evidence was that loan broker himself would have had access to that letterhead. Did you want to address law, the sentencing issues? Yes. Brief moment. Yes. I'll do — I'll do that. Our sentencing issues are that there was insufficient evidence of what the loss actually was. And as Your Honors know, the standard here is that it has to reflect economic reality here. And the government ignores its own publication that states that that — that the losses should be sustained by the original lender here. This is — this is a very different case from the one that I just heard argued. And I don't — I don't have any knowledge of that fact. But I gathered from that that there was a scheme. There was an actual scheme. There was a pastor who was, in that case, who was actually, you know, scheming his parishioners, where in this case, there was no evidence of that. And there was no evidence that Mr. — Mrs. Hymas, you know, could — could have foreseen the — that the loan were going to be sold as quickly as they were made. Well, the loan documents themselves indicated that they could be sold, right? Well, there was a — yeah, there was one — there was one — a provision of that. I'll — I'll admit that. But that — it wasn't something that was discussed, that was shared with the borrowers here. And in fact, we know that it wouldn't have been because that was — that was the whole scandal in the industry itself, was that these — these banks were making loans regardless of what — of what was stated there. They were purposely avoiding the tax returns because — because in doing so, they could charge a higher interest rate. They were — they — they — they — they were — they were having these made as stated income loans so they could fall into the ALF-A category. And then they were selling them off to — to banks who sliced and diced them, put them into — put them into different — different security instruments. And there was no evidence at all introduced at sentencing as to what the actual losses were. And in fact, the government's asking the court to just assume that there was losses. We can't make that assumption. They haven't identified who those alleged victims are. They haven't — they haven't alleged what losses they suffered. The only evidence that was offered was that the banks acting as some sort of custodian role on the loan itself would have said, I would have assumed that there were losses. Well, your argument is that the original lenders haven't established loss and there's no evidence of what the banks that they sold them off to — of what their losses were? That's right. Even — even more than that, the — the evidence was unrebutted that the original lenders suffered no loss and, in fact, made money. As far as a scheme to deprive a property or whatever, you don't have to prove loss to prove the scheme, right? To disprove the intent to deprive someone. Well, you have to prove for loss. I think Your Honor is referring to the reasonable — the reasonable foreseeability standard that we apply at sentencing. Is that what Your Honor is referring to? I'm not sure. What I was driving at is, you say there's no evidence of the losses suffered by the initial lender. That's right. But there is — and you're arguing that there's not appropriate evidence of intent to deprive them of property or real estate, so that there's no proof of specific intent. That's right. And is that tied to the fact that they — you say — what you say is that they didn't suffer any — prove any losses? You can — That's — You can have the specific intent to deprive someone of a property, in this case, a loan, and that would be sufficient, even if they didn't suffer a loss. I see what you're saying. I see what the argument is. And, Your Honor, I think the government is asking you to make two assumptions. They're asking you to make the assumption that there was specific intent, when there was no evidence introduced with anyone at the bank that had actual knowledge of these loans. There was just the customs and practices themselves. And the second point being that there was no evidence of who these alleged victims actually were. The government is asking the court to assume that there were victims, asking the court to assume that there were — those victims suffered — those alleged victims suffered losses for purposes of sentencing without any evidence of either of those two things. Mr. Mufford, you're over your time. I know. Thank you, Your Honor. We'll hear from the government. May it please the Court. Serena Case Hargrove, on behalf of the government. Judge Fisher is precisely correct. Loss is not an element of wire fraud. The question of loss comes in both for sentencing and for restitution. And it's judged under, for sentencing, a reasonably foreseeable standard. So the question is, was it reasonably foreseeable that a loss would occur from this scheme? And in restitution, it's the question of whether victims were directly and proximately harmed. Judge Okuda was also correct. So just to follow through, and counsel said there's no proof of foreseeability and no proof of who, for purposes of restitution, actually suffered losses. There was ample proof, Your Honor. For purposes of restitution and sentencing loss, there was a day-long hearing at which numerous witnesses testified, one from each available bank. It's true we couldn't present evidence on two of the loans for — I think we only presented evidence on two of the loans for restitution because it is so difficult to determine how much loans were sold for on the secondary market. So Mr. Hymas received a benefit in that way because we couldn't prove on the other three loans what those successor entities had purchased them for. But we could prove it on two of them, and we did. And Judge Lodge referred in some detail to the evidence on which he was relying, and that's in Exhibit of Record, page 12, where he summarizes all of the witnesses' testimony that established loss for purpose of restitution. The question of loss for sentencing was also well-established, and the loss to the successor lenders was reasonably foreseeable. This is one area in which there isn't a great deal of Ninth Circuit law. Bernadelle is an unpublished memorandum disposition. Judge Acuto is on that panel. But we — the Smith Court on the Tenth Circuit addressed precisely this issue. And in this case, not only did the loan documents just above the signatures of the defendant and — or his wife, in this case, on a number of the loans say that these loans were transferable. They also said that successors were entitled to rely on the continuing validity of the information. And all we need in this case is to say that there's reasonably foreseeable that the other lenders down the road or other purchasers down the road. Yes. Yes. That meets 2B1.1 standard abundantly, yes. And there is great Ninth Circuit law applying that standard. Treadwell, we cited it in our brief. So it's not a leap at all, yes. It's very reasonably foreseeable. And that's already been held in the restitution context by Young. Judge Acuto was also exactly correct that a bank employee did say that although she knew she was not supposed to send the verification of deposit form to depositors, she knew she wasn't supposed to do that. During that time period, she did at times. So she acknowledged that. Furthermore, the government presented expert testimony from a loan auditor explaining that the way the process worked, it would be very unlikely for a bank employee to alter those numbers. It would require the collaboration of at least two people in the bank. It's also worth noting that on ER 237, that's where Mr. Hymas claimed that they had around $20,000 of deposits currently in the bank. And when you look at the alterations on that loan form, on the verification of deposit form, ER 233, those alterations end up making the deposits add up to almost precisely the amount that he had represented on Susan's behalf was in their bank accounts at the time. So that, too, is evidence that the jury could consider and from which it could draw reasonable inferences. The opposing counsel references ER 2117 as contradicting the government's evidence that shows 2006 totals deposit amount of like $182,000. Can you address that, please? Yes. The government introduced several different exhibits, and the one that counsel was referring to is 16-1A. That was a record of all of the exhibits that the government had. That was a record of the deposits that went into Travis and Susan Hymas' account. Now, it's interesting. A number of those deposits were actually funded loans. So there's a loan that was deposited so that they could purchase a Ski-Doo. There were quite a number of loans that were deposited so they could purchase automobiles. And those are found on pages 2092, 2109, 2112, and 2113. So the idea that this was income is simply absurd. A lot of these were actually liabilities. Big chunks of these were liabilities. So the FBI forensic accountant did an excellent job of very generously going through every single one of those deposits and attributing anything that could possibly be income, placing it in a separate chart that was Exhibit 16-3A. And that chart can be found on pages, I believe, 1593 or 1926. That chart explains really how much could possibly be attributed to income. And in that chart, it's clear that Susan Hymas, the one who was representing, she was making $15,000 a month, or the defendant was representing, she was making that herself, was actually earning less than $300 a month. Now that accorded with the tax returns, which listed her as a student. So the government was not simply relying, as opposing counsel says, on one statement of income. The government was relying on the fact that Susan Hymas, who on her tax returns was saying she was a student, who through the FBI forensic analysis showed she was earning less than $300 a month, was supposedly suddenly making $15,000 a month on Loans 1 and 2, and $12,000 a month was significant rental income that never existed on Loans 3 and 4. Furthermore, there was tremendous evidence that a great deal was done to confirm the supposed fact that she held a high position as the Northwest Regional Operations Manager for the company that defendant co-owned. And I would like to make one correction, too. There was no evidence in the record that Susan was a co-owner of Smart Home. There was definitely evidence that her husband was, but not that she was. So that was among the evidence that the government was relying on. With respect to materiality, I would just like to note that the government presented testimony from numerous experts and bank employees that income, the debt-to-income ratio, a defendant's assets in that form of the verification of assets, a defendant's employment, and a defendant's education were all very important to the banks, especially on these stated income verified asset loans. So the fact that there may have been strange things going on, and there was testimony as to especially one company that there were very strange things going on, does not mean that certain things weren't very important to the bank. And the bank indeed, in the record you can tell, they went to the trouble of verifying Susan's employment. By hand. Someone called and spoke to Travis Hymas, who was the perpetrator of the fraud, and he confirmed that she worked there, not only that she worked there, but that she held the position he had listed on the loan application and received the salary. There was also testimony from the office manager that she was asked to read a script to confirm those same facts so that they would qualify for a loan. There is ample evidence of a scheme. There is ample evidence of loss, both for purposes of sentence and for restitution. Unless there are any further questions, Your Honors, the government would submit, simply request that you affirm. Thank you, counsel. Thank you. You have one minute. I'll give you one minute. You can have a minute. Thank you, Your Honor. Just a few points in rebuttal. The government started its argument by pointing out, to Your Honor, that loss was not an element of the crime. That's not disputed. But in fact, that's why we argue that Judge Laws applied the wrong standard for purposes of determining what the loss was. That he should have applied a heightened evidentiary standard because of the disproportionate impact on the sentence. The government argues in response to your argument about the verification of deposit. Your Honor, with respect to that verification itself, the testimony of the witness was that she did not. And I refer to, Your Honor, it's ER 1734 and ER 17, either 71 or 1721. I can't read my writing just right now. With respect to the argument as to ER 2117, the exhibit that we attached to our reply brief, the government's argument proves our point. That was all of the deposits. Because the standard here is a gross income standard. And that's why the government's argument now that, yes, that income in the bank account would have included liabilities as well, that's beside the point, because the standard is a gross income standard. With that, I'll thank the Court. Thank you. Thank you, Mr. Muffitt. Thank you, counsel. I appreciate it. Have a safe trip back. Thank you.
judges: Fisher, Paez, Ikuta